Kevin **ROBERTSON**, Appellant,

v.

Albert **FIORE**; Hudson County Improvement Authority.

No. 94–5485.

United States Court of Appeals, Third Circuit.

Argued June 28, 1995.

Decided Aug. 16, 1995.

Norman A. Doyle, Jr. (argued), Doyle & Brady, Kearny, N.J., for appellant.

Gerald T. Ford (argued), Adam J. Hanover, Siff Rosen, Newark, N.J., for appellees.

Before HUTCHINSON, ROTH and GARTH, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM:

Kevin Robertson, a member of the Democratic party, appeals from an order which granted summary judgment in favor of his former employer, the Democratically controlled Hudson County Improvement Authority (HCIA), on his 42 U.S.C. § 1983 claim. Robertson had alleged a violation of his First and Fourteenth Amendment rights to political association and a violation of his Fourteenth Amendment right to due process.

We conclude that the record does not support an inference that the HCIA discharged Robertson on account of his political affiliation and does not support his claims to a property or liberty interest in his employment protected by the Fourteenth Amendment. We therefore affirm the judgment of the district court on this ground. We write to clarify that the constitutional limitations on political patronage, recognized in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), extend to intraparty political disputes as well as interparty political disputes.

### I.

After working as a legislative aide to Gerald McCann, former Mayor of Jersey City, Robertson was appointed as a Supervisor at the HCIA's waste processing center on April 15, 1991. The HCIA is responsible for the pick up and disposal of all Jersey City municipal waste. After classifying waste as either standard or bulky waste at a sorting facility, the HCIA ships the refuse to a landfill operated by the Hackensack Meadowlands Development Commission ("HMDC") or to an out-of-state facility. As a supervisor, Robertson was one of three people responsible for the classification and management of waste as it arrived at the HCIA sorting facility.

Robertson's short tenure at HCIA was marked by difficulties. Robertson's failure properly to classify waste prompted complaints by Waste Management, the company which handled HCIA waste bound for the HMDC landfill. Albert Fiore, the HCIA Executive Director, noted that in May 1991 he found Robertson seated in a location where it was impossible to examine the incoming waste for which he was responsible. On numerous occasions, Robertson smoked in the working areas of the HCIA sorting facility despite verbal and written warnings to stop. Because dry paper is scattered around the facility, Robertson's smoking endangered other workers and the building. Following personal conflicts, Robertson threatened his

coworkers that he would use his relationship with. Mayor McCann to have them discharged and physically intimidated at least one of his subordinates.

In an affidavit, Robertson alleged that his mistakes in classifying waste were the result of sporadic training by HCIA, an account not supported by other evidence in the record. Robertson admitted to smoking at the sorting facility but alleged that others also smoked. Robertson does not deny that Waste Management complained about his failure to classify waste properly or that Waste Management complained that he sought to intimidate its employees based on his political affiliations. Nor does he deny Fiore's account of his failure to monitor trucks properly in May 1991.

In an attempt to address these concerns about Robertson's performance, Fiore brought the complaints to the HCIA Board's attention on June 5, 1991 and received authority from the HCIA Board to discipline or fire employees in his own discretion.[1] Fiore gave HCIA employees notice of his authority on June 7.

On the same day, Robertson received a phone call from Mayor McCann's office. McCann had entered a disputed race for Chairman of the Hudson County Democratic Party. Both McCann and Robert Janiszewski, the Hudson County Executive, were seeking control of the Chairmanship and the party. McCann asked Robertson to organize the city of Kearny in support of his candidacy. Robertson took leave on June 9 and June 10 to support McCann's efforts. Because the leave required administrative approval, Fiore became aware of Robertson's activity.

On June 11, 1991, at separate meetings, both McCann and Bruce Walter, Janiszewski's candidate, were elected as Chairman with competing claims. Fiore supported Janiszewski in the election. Ultimately, McCann's election was declared invalid.

Following these elections, a political battle erupted for control of the HCIA. Between June 11 and July 1, McCann sought to replace the HCIA Board and terminate Fiore. McCann's attempts failed, and on August 8, 1991, Janiszewski forced a reorganization of the HCIA Board and eliminated all of McCann's supporters.

In the interim, Robertson continued to defy HCIA rules. On June 7, 1991, Robertson was reprimanded by his political ally Jerry Papick for smoking at the HCIA facility. On the same day, another employee filed a complaint that Robertson had called Fiore a derogatory name and had questioned Fiore's authority. On June 13, 1991, two HCIA employees reported that Robertson had interfered with their work, had harassed them based on their political affiliation, and had verbally and physically threatened them.

On June 20, 1991, Fiore placed three memos in Robertson's files, documenting the complaints of misconduct. The next day, Fiore notified Robertson that he intended to discharge him for insubordination and poor performance and suspended him with pay, pending an administrative hearing. The HCIA's affidavits state that other McCann supporters were retained after the political dispute was resolved.

After legal wrangling between Robertson and the HCIA regarding whether the grievance hearing should be transcribed, Robertson received a hearing on the misconduct charges. Robertson complained that the hearing was conducted by Sheldon Cohen, a partner at DeCotiis & Pinto, a law firm which was representing Fiore and Janiszewski in a separate legal challenge to their authority over the HCIA. Cohen denied Robertson's motion to disqualify, heard Robertson's grievance claim, and affirmed the decision in HCIA's favor.

Soon thereafter, Robertson filed this 42 U.S.C. § 1983 claim, alleging a violation of his First Amendment right to political association, a violation of the due process clause, and pendent state law claims. Following discovery, the district court granted the HCIA's motion for summary judgment on all Robertson's claims. The district court grant-

---

1. Robertson contends that the meeting minutes do not mention his name even though they reflect the grant of personnel authority to Fiore. Robertson does not deny that he had personnel trouble nor did he seek any evidence from participants at the meeting that he was not mentioned.

ed judgment on the due process claims because Robertson failed to demonstrate any protected liberty or property interest. With respect to the First Amendment claim, the court concluded that dismissals based on intraparty conflicts do not state a claim under the First Amendment and that Robertson failed to produce evidence which would permit a jury to conclude that his political association was a substantial cause of his dismissal. Robertson filed a timely notice of appeal.

## II.

■ We exercise plenary review over a grant of summary judgment. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.) (en banc), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). We apply the same test that the district court should have applied initially. *Id.* Summary judgment is appropriate only when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Id.; see* Fed.R.Civ.Proc. 56(c) (1994). In reviewing the record, we give the nonmoving party the benefit of any reasonable inferences that can be drawn from the record, leaving credibility determinations for trial. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir.1993); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1077 (3d Cir.1992); *Chipollini*, 814 F.2d at 900.

## III.

"To the victor belong only those spoils that may be constitutionally obtained." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64, 110 S.Ct. 2729, 2731, 111 L.Ed.2d 52 (1990). In this manner, Justice Brennan summarized the principle, recognized by the Supreme Court in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), that public agencies may not hire, transfer, promote, or discharge pub-

lic employees based on their political affiliations unless their work requires political allegiance. This principle flows from the constitutional prohibition against discharging public employees on account of their speech regarding issues of public concern. *See Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

■ To make out a claim of discrimination based on political association, a public employee must prove (1) that the employee works for a public agency in a position that does not require a political affiliation,[2] (2) that the employee maintained an affiliation with a political party, and (3) that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision. *Laskaris v. Thornburgh*, 733 F.2d 260, 265 (3d Cir.), *cert. denied*, 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984); *Perez v. Cucci*, 725 F.Supp. 209, 238–39 (D.N.J.1989), *aff'd*, 898 F.2d 139 (1990). If the employee demonstrates these elements, the employer may avoid a finding of liability by demonstrating by a preponderance of the evidence that it would have made the same decision even in the absence of the protected affiliation. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Laskaris*, 733 F.2d at 264.

The HCIA does not dispute that Robertson was a public employee whose position does not require political allegiance. Thus, that element of Robertson's claim is satisfied.

### A.

■ However, the HCIA argues that Robertson did not maintain a protected political affiliation because Robertson belonged to the same political party as Fiore and the other HCIA officers. According to the HCIA, the Constitution comes into play only when the dispute is between members of a different

---

**2.** While the employee must demonstrate employment by a public entity, the employer bears the burden of proving that the position is one for which party affiliation is an appropriate requirement, should it choose to raise the issue. *Peters v. Delaware River Port Auth. of Penn. & New*

*Jersey*, 16 F.3d 1346, 1353 (3d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 62, 130 L.Ed.2d 20 (1994); *Laskaris v. Thornburgh*, 733 F.2d 260, 264 n. 4 (3rd Cir.), *cert. denied*, 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984).

political party. Hence, HCIA maintains that, in the present context, only Republicans are protected from politically motivated discharge by the Democratically controlled HCIA Board and administration. We disagree.

The constitutional prohibition against patronage derives from the coercive aspects of the spoils system which inhibit the rich political discourse protected by the First Amendment. *See Elrod,* 427 U.S. at 355–60, 96 S.Ct. at 2680–83. Without the protection afforded by the Constitution, employees might forgo the expression of their political beliefs or artificially change their political association to avoid displeasing their supervisors. *Id.* Such coercion, whether direct or indirect, is incongruent with a free political marketplace.

The danger that employees will abandon the expression or exercise of their political beliefs to appease their supervisors is not diminished because a supervisor supports a different identifiable faction within a party as compared to a different party altogether. *Tomczak v. City of Chicago,* 765 F.2d 633, 640 (7th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985). Whenever an employee, whose position does not require political decision making, yields his political will to his superior, the political process is harmed whether the employee is of the same or a different party.

Because of the dominance of one political party in some locations, intraparty battles will sometimes overshadow interparty battles. *Id.; Barnes v. Bosley,* 745 F.2d 501, 506 n. 2 (8th Cir.1984). For example, in Cook County, Illinois, Democratic dominance may diminish the significance of all elections following the primaries. In Orange County, California, Republican influence may similarly overwhelm Democratic opposition. If the First Amendment did not reach intraparty patronage practices, public employees in these and similar locations would not enjoy the same political rights as their counterparts in more politically diverse locales.

As the Seventh Circuit has recognized, opposition to a manager's political superiors can "make[ ] the candidate a political enemy of his boss whether or not they are members of the same party—some of the bitterest political fights are intraparty fights; consider Senator Edward Kennedy's campaign to supplant President Carter as the Democratic Party's 1980 Presidential candidate, or Patrick Buchanan's campaign to supplant President Bush as the Republican Party's 1992 Presidential candidate." *Wilbur v. Mahan,* 3 F.3d 214, 218 (7th Cir.1993).

Previously, in *Liotta v. Borough of Springdale,* 985 F.2d 119 (3d Cir.1993), we had considered the question presented here, but did not decide it because there was no evidence that Liotta's political affiliations contributed to his discharge. Nonetheless, we expressed concern with according intraparty disputes equal weight:

> Certainly if First Amendment protections against terminations for political reasons are to be extended beyond the clearly delineated situations in which employees claim they were discharged by reason of a change in the party controlling the government office with the power of appointment and discharge, a point we do not decide, an employee's case must be based on more than speculation. Otherwise, there is a danger that disputes among public officials of every nature would be characterized as "political" in an attempt to bring the action within the First Amendment framework.

*Id.* at 122. Whatever concern we had in *Liotta* that employees might manufacture "political" disputes to seek a remedy for layoffs which resulted from poor performance, this case does not present them. Where, as here, a public employee is associated with an identifiable political faction within a single party, we need not be concerned that his activities were not legitimately political or legitimately divisive.

In this case, McCann and Janiszewski campaigned vigorously against one another for the leadership of the Hudson County Democratic party. This fiercely contested political battle proved to have an important impact on the predominately Democratic county. The record makes clear that Fiore and Robertson had aligned themselves on opposing sides of this dispute. The fact that the record does not support Robertson's

claims that he was the subject of a political discharge does not mean that Robertson's affiliation with the McCann faction of the Democratic party lacked protection under the First Amendment.

Hence, because the dangers inherent in vigorous intraparty conflicts are equivalent to the dangers presented by interparty conflict, we conclude that the Constitution, as interpreted in *Elrod, Branti,* and *Rutan,* protects a Democratic employee equally from discharge for supporting a losing Democrat as for supporting a losing Republican. In doing so, we join all other courts that have previously addressed this question. *Dickeson v. Quarberg,* 844 F.2d 1435, 1437 n. 2 (10th Cir.1988); *Tomczak v. City of Chicago,* 765 F.2d 633, 640 (7th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985); *Barnes v. Bosley,* 745 F.2d 501, 506 n. 2 (8th Cir.1984), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985); *see also Bennis v. Gable,* 823 F.2d 723, 727 n. 4 (3d Cir.1987) (reaching the same conclusion in dicta); *Perez v. Cucci,* 725 F.Supp. 209 (D.N.J.1989) (finding a violation in the case of an intraparty conflict without expressly addressing the question), *aff'd,* 898 F.2d 139 (1990).

**B.**

■ Having considered the first two elements of Robertson's First Amendment claim, we reach the issue of causation. We find no merit in Robertson's argument that he produced sufficient evidence to substantiate a claim that his political affiliation with Mayor McCann was a substantial or motivating factor in his discharge.

The record amply reflects Robertson's poor performance at the HCIA. He endangered the sorting facility by his smoking. He verbally and physically threatened other employees. He demonstrated little interest in his responsibilities and repeatedly misclassified waste, imposing additional costs on the HCIA and its contractors.

Robertson admits most of this behavior. Nonetheless, he seeks to defeat summary judgment by arguing that others performed poorly but were not discharged as well. His evidence is belied by the frequency and number of complaints from HCIA contractors and employees directed at Robertson and Robertson alone. Further, Robertson fails to identify the similar situated employees who he alleges also flaunted HCIA rules and does not identify their political affiliation to permit a relevant comparison. Nor does he address the HCIA's statement that three identified McCann supporters were retained by the HCIA following the political battle.

This record will not support a conclusion that politics, rather than poor performance, caused Robertson's discharge, and thus we affirm the district court's grant of summary judgment on the First Amendment claims.

**IV.**

Similarly, we find no merit in Robertson's claims that the HCIA deprived him of due process. Robertson was an at will employee. Consequently, he lacks a protected property interest in his position within the meaning of the Fourteenth Amendment. *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1398–99 (3d Cir.1991) (limiting protected property interest to claims of legal entitlement, dependence, or permanence). Nor does he allege that the HCIA foreclosed his opportunity to pursue a career by imposing a legal or administrative disability which deprived him of a protected liberty interest. *See Siegert v. Gilley,* 500 U.S. 226, 234, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991) (damage flowing from harm to reputation alone does not give rise to a protected liberty interest); *Valmonte v. Bane,* 18 F.3d 992, 1001 (2d Cir.1994) (requiring an affirmative disability to make out a due process claim). Consequently, Robertson's due process claim fails. *Robb v. Philadelphia,* 733 F.2d 286, 292 (3d Cir.1984).[3]

**3.** Robertson's brief does not argue that the district court improperly granted summary judgment on his state law claims. Accordingly, we consider any appeal from these claims to be waived. *Industry Network Sys. Inc. v. Armstrong World Indus. Inc.,* 54 F.3d 150, 152 n. 4 (3d Cir.1995).

V.

Because the record does not reflect genuine issues of disputed material fact in Robertson's First Amendment or due process claims, we will affirm the district court's grant of summary judgment.