SUPERIOR COURT
OF THE
STATE OF DELAWARE

E. SCOTT BRADLEY
JUDGE

1 The Circle, Suite 2
GEORGETOWN, DE 19947

July 13, 2018

Daniel C. Herr, Esquire
Law Office of Daniel C. Herr, LLC
1225 N. King Street, Suite 1000
Wilmington, DE 19801

Colleen K. Norris, Esquire
New Castle County Office of Law
87 Reads Way
New Castle, DE 19720

Daniel J. Brown, Esquire
McCarter & English, LLP
405 N. King Street, 8th Floor
Wilmington, DE 19801

> RE: **Grimaldi v. New Castle County, et al.**
> C.A. No: N15C-12-096 (ESB)

Dear Counsel:

This is my decision on the Motion for Summary Judgment filed by Defendants Thomas Gordon and New Castle County in this case involving Gordon's firing of Plaintiff David Grimaldi. Gordon was the New Castle County Executive. Grimaldi was Gordon's Chief Administrative Officer. On October 27, 2015, Grimaldi's car was pulled over by an Elsmere police officer because the police officer thought that Grimaldi's driver's license was suspended. During the traffic stop, Grimaldi told the officer: "You know your Mayor works for me. You know your Mayor works for me, right." Grimaldi tried to call the Elsmere Mayor, Steven Burg, during the traffic

stop purportedly for a ride home, but Grimaldi was unable to reach Burg because Burg was in a New Castle County Council meeting. Burg was, in addition to being the Elsmere Mayor, a New Castle County Executive Assistant and was subordinate to Grimaldi. Gordon fired Grimaldi on October 29, 2015. Grimaldi told *The News Journal* and others that he was fired because he questioned Gordon about his relationship with the County's Risk Manager, Cheryl McDonaugh. On November 1, 2015, *The News Journal* ran an article quoting Gordon as stating that he fired Grimaldi because he was "clearly trying to influence the outcome of his traffic stop. It was clearly improper to say that to the officer and try to call the Mayor from the car." Grimaldi filed this lawsuit against Gordon and New Castle County on December 10, 2015. Grimaldi's only remaining claim against the Defendants is his stigma-plus defamation claim.

I have granted the Defendants' Motion for Summary Judgment, concluding that (1) Grimaldi's stigma-plus defamation claim fails because he did not ask the Defendants for a name-clearing hearing, (2) Grimaldi, because of his high-ranking County position and colorful past, was able to tell his side of the story about his traffic stop and firing to all that were interested in it, and (3) Gordon is not personally liable to Grimaldi for monetary damages because Gordon and the County did not deny Grimaldi a name-clearing hearing.

## STANDARD OF REVIEW

This Court will grant summary judgment only when no material issues of fact exist, and the moving party bears the burden of establishing the non-existence of material issues of fact.[1]  Once the moving party meets its burden, the burden shifts to the non-moving party to establish the existence of material issues of fact.[2]  The Court views the evidence in a light most favorable to the nonmoving party.[3]  Where the moving party produces an affidavit or other evidence sufficient under *Superior Court Civil Rule 56* in support of its motion and the burden shifts, the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial.[4]  If, after discovery, the non-moving party cannot make a sufficient showing of the existence of an essential element of the case, then summary judgment must be granted.[5]  If, however, material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law

---

[1] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[2] *Id.* at 681.

[3] *Id.* at 680.

[4] *Super. Ct. Civ. R. 56(e); Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[5] *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991), *cert. den.*, 112 S.Ct. 1946 (1992); *Celotex Corp.*, 477 U.S. 317 (1986).

3

to the facts before it, then summary judgment is not appropriate.[6]

**DISCUSSION**

The Defendants argue that Grimaldi's stigma-plus defamation claim must be dismissed because (I) Grimaldi did not ask for a name-clearing hearing; (II) Grimaldi received a meaningful opportunity to clear his name through his access to the media and by other means; and (III) Gordon is entitled to qualified immunity in his individual capacity.

## I. Don't Ask-Don't Tell

The Defendants argue that Grimaldi's stigma-plus defamation claim must be dismissed because he did not ask them to give him a name-clearing hearing after he was fired. Grimaldi argues that the Defendants were required to offer to give him a name-clearing hearing and did not do so. For a government employee, a cause of action for the deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of the employee's dismissal from government employment.[7] The process that is due to the government employee in such a situation is a name-clearing hearing.[8] Of course, if a name-

---

[6] *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del. 1962).

[7] *Patterson v. City of Utica*, 370 F.3d 322, 330 (2004).

[8] *Id.*

4

clearing hearing is not given when required, then the government employee may pursue a stigma-plus defamation claim and seek monetary damages for the failure to be given a name-clearing hearing.[9] Grimaldi admits that he did not ask the Defendants for a name-clearing hearing at any time, not even when he filed his lawsuit against the Defendants. The Defendants raised Grimaldi's failure to do so as one of their affirmative defenses.

The United States Supreme Court has not decided the issue. Seven Courts of Appeals have decided the issue. Five of the seven require a plaintiff to ask for a name-clearing hearing in order to maintain a stigma-plus defamation claim.[10] The Eighth Circuit set forth the rationale for the requirement:

> [N]othing in our jurisprudence suggests that a government employee can legitimately sue for deprivation of the right to a post-termination hearing where he has never asserted the right before suing for damages. Allowing an employee to claim damages for being deprived of a hearing never requested would greatly expand government employers' potential liability and force such employers prophylactically to offer name-clearings when it is not all clear that the employee is

---

[9] *Patterson v. City of Utica*, 370 F.3d 322, 337 (2d Cir. 2004).

[10] *E.g., Buntin v. City of Boston*, 813 F.3d 401, 406 (1st Cir. 2015) ("the government must have failed to comply with the employee's request for a name-clearing hearing"); *Bellard v. Gautreaux*, 675 F.3d 454, 462 (5th Cir. 2012) (plaintiff must show that "he requested a hearing to clear his name"); *Quinn v. Shirley*, 293 F.3d 315, 323 (6th Cir. 2002) ("a plaintiff must request and be denied a name-clearing hearing"); *Crooks v. Lynch*, 557 F.3d 846, 849 (8th Cir. 2009) (a plaintiff "must prove he requested and was denied a name-clearing hearing"); *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (holding the request for a name-clearing hearing need not be explicit, but must be "reasonably clear").

5

entitled to – or even desires – one.  It would also reward employees for lying in wait and later asserting a right that the employer had no reason to suspect the employee wanted to exercise in the first place. ...[W]e agree with the case law developed in other circuits that holds that an employee who fails to request post-termination process cannot later sue for having been deprived of it.[11]

The Third Circuit has not decided the issue and the district courts within the Third Circuit are split on the issue.  The Parties have cited to eleven cases at the District Court level within the Third Circuit that discuss whether or not it is the responsibility of the employer to offer or the employee to ask for a name-clearing hearing.  The Defendants have cited six cases.[12]  All of the cases cited by the Defendants have been decided in the Eastern District of Pennsylvania.  Grimaldi has cited five cases.[13]  All of the cases cited by Grimaldi have been decided in the

---

[11] *Winskowski v. City of Stephen*, 442 F.3d 1107, 1111 (8th Cir. 2006).

[12] *Dean v. City of Coatesville*, 2010 WL 1005142, at *4 (E.D. Pa. Mar. 17, 2010) ("the better part of the district court cases in [the Third] Circuit ... have held that a plaintiff must have requested a name-clearing hearing to proceed on a procedural due process claim in this context."); *Greene v. Street*, 2011 WL 2517144, at *4  (E.D. Pa. June 22, 2011) ("a name-clearing hearing must be requested prior to bringing a liberty interest claim"); *Schlichter v. Limerick* Township, 2005 WL 984197, at *8 (E.D. Pa. Apr. 26, 2005) ("an aggrieved employee must plead and prove that he timely requested a name-clearing hearing and that the request was denied."); *Hill v. City of Chester*, 1994 WL 463405, at *7 n.8 (E.D. Pa. Aug., 1994) ("A request for such a hearing is a prerequisite to making a claim under the liberty interest of the Due Process Clause"), aff'd, 60 F.3d 815 (3d Cir. 1995); *O'Connell v. County of Northampton*, 79 F.Supp. 2d 529, 536 (E.D. Pa. 1999) ("even is plaintiff had been effectively discharged, his failure to see a 'name-clearing' hearing would bar his claim"); *Freeman v. McKellar*, 795 F.Supp. 733, 739 (E.D. Pa. 1992) ("even a discharged employee must allege that he timely requested a hearing to clear his name and that the request was denied").

[13] *Magni v. Times-Shamrock*, 2016 WL 1060278, at *4 (M.D. Pa. Mar. 11, 2016) ("This Court will not peremptorily cut off Plaintiff's ability to proceed on a stigma-plus due process

6

Western District of Pennsylvania, the Middle District of Pennsylvania, and the District of Delaware. Grimaldi has not offered a rationale for his argument that it is the Defendants who should have offered to give him a name-clearing hearing after Gordon fired him.

I agree with the rationale of the Eighth Circuit and conclude that Grimaldi should have asked the Defendants to give him a name-clearing hearing. I reach this conclusion because it appears to be the prevailing view among the courts that have addressed the issue and it makes the most sense for a number of reasons. One, it only seems logical to me that if Grimaldi felt aggrieved as a result of his firing and wanted to clear his name, then he should have asked the Defendants to give him a name-clearing hearing. Quite simply, if you want something from your employer, then you should ask your employer for it. Your employer might not, as the Eighth Circuit

---

claim where she has not alleged that she requested a name-clearing hearing and the Third Circuit has not expressly declined to day that she must."); *Andrekovich v. Chenoga*, 2012 WL 3231022, at \*9 n.3 (W.D. Pa. Aug. 6, 2012) ("Whether plaintiff ultimately can recover any one or more of his alleged damages under such circumstances is best determined is and when it becomes necessary to do so after full development of the record. Similarly, defendants' attempt to find shelter in the fact that plaintiff does not allege that he demanded a name-clearing hearing is wide of the mark. Plaintiff is not required to do so."); *Smith v. Borough of Dunmore*, 2011 WL 4458787, at \*6 (M.D. Pa. Sept. 23, 2011) ("A plaintiff need not request a name-clearing hearing in order to assert his claim."); *Erb v. Borough of Catawissa,* 749 F.Supp.2d 244, 251 (M.D. Pa. 2010) ("A plaintiff's failure to request such a hearing is not fatal to his claim."); *Gillespie v. Hocker*, 2015 WL 4468922, at \*4 (D. Del. July 22, 2015) ("When an individual is deprived of a liberty interest in reputation, the employee is entitled to a name-clearing hearing.") (This Court notes that the District Court did not make a finding on who's responsibility it was to request a name-clearing hearing, only that the employee was entitled to a hearing.).

7

pointed out, know that you want something. Moreover, as between Grimaldi and the Defendants, Grimaldi was certainly in the best position to determine which claims, if any, to pursue as a result of his firing. Grimaldi was also in the best position to assess the strength of his claims. Only Grimaldi was in the position to know what he meant when he told the Elsmere police officer that "You know your Mayor works for me. You know your Mayor works for me, right." If Grimaldi believed that he was defamed in the course of his firing, then he certainly could have asked the Defendants to give him a name-clearing hearing. Grimaldi never did. The Defendants certainly did not believe that they had defamed Grimaldi. Grimaldi's statement to the Elsmere police officer certainly suggested that Grimaldi was trying to use his position to get out of a traffic ticket. Indeed, Grimaldi did not tell the Defendants what his statement meant until more than two years after he was fired when he testified at his deposition that he was "just making conversation" with the Elsmere police officer. I know that Grimaldi told everyone that Gordon fired him because he questioned Gordon about his relationship with McDonaugh, but his explanation for what he told the Elsmere police officer was a long time in coming and rings hollow. Two, Grimaldi has done exactly what the Eighth Circuit warned about. After Grimaldi was fired, he quickly told his side of the story to a number of County executives, politicians, and political donors. Grimaldi also quickly spoke to the media multiple times, which publicized

8

his side of the story for the public. Grimaldi then, just a little over a month after being fired, filed a complaint against the Defendants for monetary damages. In doing so, he has attempted to turn the usual remedy for a stigma-plus defamation claim – a name-clearing hearing that affords no monetary remedy – into a claim for substantial monetary damages and attorneys' fees. Grimaldi went to considerable lengths to clear his name by getting his side of the story out to both those he thought should hear it and the public at large without a name-clearing hearing and is now seeking monetary damages. This is precisely what the Eighth Circuit warned about. I certainly agree that it is a legitimate concern. I have granted the Defendants' Motion for Summary Judgment based on the Defendants' argument that Grimaldi should have asked the Defendants for a name-clearing hearing and that his failure to do so prevents him from pursuing his stigma-plus defamation claim.

## II. Grimaldi's Name-Clearing Opportunities

The purpose of a formal name-clearing hearing is solely "to provide the person an opportunity to clear his name."[14] The Defendants argue that due process was satisfied because Grimaldi had many ample and sufficient opportunities to clear his name. They point out that Grimaldi raised his allegations about Gordon with several high-ranking County executives, politicians, Gordon's political donors, the

---

[14] *Codd v. Velger*, 429 U.S. 624, 627 (1977).

Democratic party, and the media (print, internet, radio, and social). Grimaldi argues that a formal name-clearing hearing would have offered him a better opportunity to address the conflicting news accounts of his traffic stop and firing.

The *Matthews* Factors

Due process, as the Defendants point out, is flexible.[15] The procedural protections required depend on the rights and interests at stake in any particular case.[16] Thus, under *Matthews v. Eldridge*, this Court must balance three factors: the private interests at stake, the governmental interests, and the value of procedural requirements in that particular case.[17] The *Matthews* factors are applied where, as the Defendants allege in this case, an employee – Grimaldi – has received an opportunity to clear his name despite not having had a formal name-clearing hearing.[18] In situations like this, the employee has a private interest in being heard so that he can refute the government employer's stigmatizing statements.[19] The government's interest is two-fold: (1) "preserving its official's ability to make personnel decisions and communicate the reasons for those decisions to the public, particularly

---

[15] *Matthews v. Eldridge*, 424 U.S. 319, 334 (1976).

[16] *Graham v. City of Philadelphia,* 402 F.3d 139, 146 (3d. Cir. 2005).

[17] *Matthews*, 424 U.S. at 335.

[18] *Graham,* 402 F.3d at 146-147.

[19] *Graham*, 402 F.3d at 146.

10

where...the decisions implicate matters of heightened public concern," and (2) "conserving public resources."[20] In evaluating the third factor, courts weigh the "probable value" of a formal name-clearing hearing against the opportunities the employee had to tell his side of the story.[21]

### 1. Grimaldi's Private Interests

Grimaldi's interests are substantial. Gordon told the press that he fired Grimaldi because Grimaldi used his position to get out of a traffic ticket. That statement, if untrue, is certainly very damaging to Grimaldi's interests. Grimaldi would like to clear his name so that he can find work. That is certainly an important interest to Grimaldi. Grimaldi claims that he was not using his position to avoid a traffic ticket and that the real reason that Gordon fired him was that he questioned Gordon about his relationship with McDonaugh.

### 2. The Defendants' Interests

The Defendants' interests are also substantial. The Defendants certainly had an interest in explaining why Gordon fired Grimaldi, particularly after the media reported Grimaldi's allegation that Gordon and McDonaugh, a subordinate employee, were involved in a romantic relationship, and that he had been fired by Gordon

---

[20] *Id.* at 147.

[21] *Id.* at 146.

because he had questioned Gordon about that relationship. *The News Journal* had also obtained the video of Grimaldi's Elsmere traffic stop and placed it online and published Grimaldi's statement to the Elsmere police officer about the Elsmere Mayor working for him. The situation certainly cried out for an explanation from Gordon as to why he fired Grimaldi. Was it because Grimaldi had abused his position one too many times or was it because Gordon had grown tired of Grimaldi's questions about his relationship with McDonaugh?

Moreover, Gordon and Grimaldi, aside from the controversy swirling around Grimaldi's traffic stop and firing, were already controversial figures. Gordon, as the County's Chief Executive and his then-Chief Administrative Officer, had some years earlier faced charges in Federal Court that they had "devised and participated in a scheme to defraud New Castle County and its citizens of the intangible right to their honest services."[22] The charges related to Gordon's alleged involvement in a private developer's efforts to get County land use approval for a golf course.[23] Grimaldi had, while the Chief Administrative Officer, been involved in a bar fight at the restaurant "Pastabilities" in the City of Wilmington. Grimaldi called County Chief of Police Elmer Setting to the scene even though the County police had no jurisdiction over the

---

[22] *U.S. v. Gordon*, 183 Fed. Appx 202, 204 (3d. Cir. 2006).

[23] *Id.*

12

matter. Grimaldi then had Chief Setting improperly obtain the Wilmington police report. Grimaldi also got into an unpleasant verbal exchange with Nancy Schanes, an 84-year-old volunteer at the Rockwood Mansion. Schanes had volunteered at the mansion for more than 30 years. Grimaldi and his girlfriend were in a restricted area of the mansion when approached by Schanes. Schanes asked Grimaldi to identify himself. Grimaldi responded to Schanes by telling her that "he owned the place." An unpleasant exchange then took place between Grimaldi and Schanes. Ultimately, Schanes was told not to return to the mansion. The federal charges against Gordon and his then-Chief Administrative Officer and the two incidents involving Grimaldi were widely covered by the media. So, the County's top two executives were facing new allegations of misusing their respective positions and power. Grimaldi for using his office to get out of a traffic ticket, which his comments to the Elsmere police officer certainly suggest. Gordon for using his office to advance his girlfriend's career in the County and silence the person – Grimaldi – who was questioning that relationship. What was left was for Gordon to explain why he had fired Grimaldi. Gordon answered that question, stating that he did it because it was wrong for Grimaldi to us his position to try to get out of a traffic ticket. As to the second government interest – conserving County resources – a formal name-clearing hearing would have certainly taken some time and expense. The Defendants argue that since

both Grimaldi and Gordon had spoken to the media at length about Grimaldi's traffic stop and firing, it would be a waste of the County's time and money to have a formal name-clearing hearing.

3. The Weighing Analysis

After considering Grimaldi's and the Defendants' interests, as well as how those interests were affected by the facts of this case, I conclude that the probable value of a formal name-clearing hearing in a County office would have been next to nil given the opportunities Grimaldi took advantage of to tell his side of the story. Grimaldi had many opportunities, and did take advantage of those opportunities, to tell the public and others his side of the story. Quite simply, Grimaldi has not convinced me that a formal name-clearing hearing would have given him an opportunity to accomplish any more than he did on his own.

Grimaldi had many opportunities to tell his story to important people and to the public because he was no ordinary County employee. Grimaldi was instead the County's Chief Administrative Officer, a position second only to Gordon. Grimaldi also had been Gordon's campaign manager. His former and current positions gave him access to high-level County executives, County politicians, Gordon's political donors, and the Democratic party. In addition to being a high-ranking County executive, Grimaldi was also someone that the media and public had an interest in,

14

albeit for the less than noble reasons. Grimaldi was, as the Chief Administrative Officer, involved in a bar fight in a Wilmington restaurant, and a dispute with an elderly female volunteer at the Rockwood Mansion. Both incidents were widely covered by the media and certainly made Grimaldi a person of considerable interest to the media. In sum, because of Grimaldi's high-ranking County position and penchant for getting involved in very public controversies, he had much more access to the media and important people than the average employee would have had.[24] Moreover, after Grimaldi was fired and the video of Grimaldi's traffic stop was published by the media, there was even more media interest in what he had to say. A public figure with a high degree of access to the media – like Grimaldi – is treated differently under the weighing analysis than a normal employee.[25]

Grimaldi used all of this to his advantage after he was fired. Grimaldi spoke to County Chief Human Resource Officer Christine Dunning and Deputy Chief Administrator Officer Samuel Guy. Grimaldi spoke to high-ranking political figures including Penrose Hollins, who was then and still is the President *pro tem* of the New Castle County Council, and Ciro Poppiti, who was then and still is the New Castle County Register of Wills. Grimaldi spoke to some of Gordon's political donors and

---

[24] *Esposito v. Metro-North Commuter Railroad Comp.,* 856 F.Supp. 799, 807-808 (S.D.N.Y. June 30, 1994).

[25] *Laforgia v. Davis*, 2004 WL 2884524, at *9 (S.D.N.Y. Dec. 14, 2004).

15

the Democratic Party as well. In short, Grimaldi contacted those County executives and political persons that he thought were important and that should hear his side of the story. Grimaldi also used his computer skills to commandeer Gordon's official political Facebook and Twitter pages and change them to his own name with the header "David Grimaldi 2016." Grimaldi also reached the public through his easy access to the media. Grimaldi spoke with a reporter for *The News Journal*, Delaware's largest newspaper. Grimaldi gave the reporter his audio recording of his conversation with Gordon when Gordon fired him. *The News Journal* ran an article the next day which contained Grimaldi's explanation of why he believed that Gordon had fired him. Radio stations WDEL and WHYY also ran articles with Grimaldi's explanation of his firing. Grimaldi also appeared on radio station WDEL and told his side of the story. Quite simply, Grimaldi's story was out there for anyone who was interested in it.

Notwithstanding that, Grimaldi argues that a formal name-clearing hearing would have (a) reached a definitive conclusion regarding the conflicting stories about the traffic stop and why Gordon fired him, (b) legitimatized and allowed him to better address the conflicting stories about his traffic stop, (c) legitimatized and allowed him to better contest Gordon's false statements about why he fired him, and (d) not burdened the County. I have concluded that Grimaldi is wrong on all counts.

16

### a. The Nature of a Name-Clearing Hearing

Grimaldi argues that a formal name-clearing hearing would have reached a definitive conclusion about the traffic stop and why Gordon fired him. Grimaldi is wrong about the nature of a name-clearing hearing. The sole purpose of a formal name-clearing hearing is to give the employee an opportunity to clear his name. There is no definitive conclusion as to whether the employee has, in fact, cleared his name.[26]

### b. The Traffic Stop

Grimaldi argues that a formal name-clearing hearing would have given him a better opportunity to explain the conflicting stories about his traffic stop. I find Grimaldi's argument baffling. There was a video of the traffic stop. The media obtained the video and posted it online for the public to both listen to and watch. The video contained Grimaldi's statement to the Elsmere police officer, "You know your Mayor works for me. You know your Mayor works for me, right." Gordon watched the video and stated that he thought Grimaldi was trying to use his position to get out of a traffic ticket. Given Grimaldi's statement at the traffic stop and his past incidents where he used his position to (1) have the County Police Chief intervene on his behalf

---

[26] *Wojcik v. Massachusetts State Lottery Commission*, 300 F.3d 92, 104 (1st. Cir. 2002); *Quinn v. Shirey*, 293 F.3d 315, 321 (6th Cir. 2002).

17

with the Wilmington police, and (2) bully an elderly lady, Gordon's conclusion seems eminently reasonable. Grimaldi offered no explanation of his statement at the time to Gordon or apparently anyone else. Grimaldi's explanation over two years later was that he was "just making conversation" with the police officer. That rings rather hollow to me. Grimaldi offers no explanation for why he waited so long to tell his side of the story about the traffic stop and he does not say what he would have otherwise offered about the traffic stop at a name-clearing hearing if he had had one. Quite simply, Grimaldi has nothing new to offer.

## c. Gordon's False Statements

Grimaldi argues that a name-clearing hearing would have given him a better ability to contest Gordon's false statements about why he fired him. Grimaldi, despite having (1) worked for Gordon for years, (2) secretly recorded over 1,000 conversations with County Officials and employees while he was the Chief Administrative Officer, and (3) having litigated this case for over two years, offers only two examples of how he would have contested Gordon's false statements about his firing if he could have only had a name-clearing hearing. One, Grimaldi states that Gordon testified at his deposition that he was going to terminate Grimaldi the next time he came into the office and offer him a severance package. Grimaldi states further that Gordon also testified at his deposition that Grimaldi was out sick on

October 28, 2015. Grimaldi says that it is irrefutable that he was in the office on October 28, 2015, and October 29, 2015. That is all Grimaldi has to say about that. I assume his point is that Gordon never intended to fire him at all because Gordon did not do so when Gordon saw him on October 28, 2015, and only did so a day later over the phone because Grimaldi was pestering him about McDonaugh. I simply do not find that fact to be of much consequence. I note that Gordon testified at his deposition that he had formed the decision to fire Grimaldi on the morning of October 29, 2015. I think, at best, Grimaldi has an argument about Gordon's hazy recollection of an event over two years after it happened. Grimaldi told everyone that would listen that Gordon fired him because he questioned Gordon about his relationship with McDonaugh. Grimaldi had evidence to support his belief and he had used it right after he was fired. This came up during Grimaldi's phone call with Gordon and Deputy Chief Administrative Officer Samuel Guy where Gordon fired Grimaldi. Grimaldi taped the phone call. The tape, which Grimaldi had, supports Grimaldi's rationale for his firing. Gordon does defend McDonaugh during the phone call. Gordon did fire Grimaldi immediately after the following exchange between the two men:

> Mr. Grimaldi: Every day there's an incident with Cheryl, but you defend her one hundred percent because of your personal relationship. That's why.

19

Mr. Gordon: Hey, fuck you, Dave.

Mr. Grimaldi: You know that's true.

Mr. Gordon: You're fired.

Mr. Grimaldi: You know that's true. What is that, your girlfriend? Is she your girlfriend?

This is nothing new. Grimaldi had the tape of his conversation with Gordon and he gave it to *The News Journal* on October 30, 2015, the day after Gordon fired him. Gordon's conflicting testimony about when he decided to fire Grimaldi adds little to this point. The tape is far more convincing and Grimaldi had it and he used it to clear his name at the time.

Two, Grimaldi argues that Christine Dunning's deposition testimony corroborates his belief that Gordon fired him for questioning him about his relationship with McDonaugh. This goes back to the morning of October 29, 2015. County Chief Human Resources Officer Christine Dunning knocked on Grimaldi's door at work and told him "half of [her] department could possibly file hostile work environment [] complaints concerning McDonaugh." Gordon then walked in Grimaldi's office and responded to Dunning by saying "something like, well, half your fucking department will be fired." This is also nothing new. Grimaldi knew about this at the time and had a witness – Dunning – to it, just like he had a witness

– Guy – to his firing. Grimaldi could have at any time that he spoke to the media repeated the comments made by Dunning and Gordon and made it clear that Dunning could vouch for them. Indeed, the subject is discussed in *The News Journal* article that appeared on November 2, 2015. It states, in part, following:

> Grimaldi contends he was fired after questioning Gordon over the perceived influence of the county's risk manager, Cheryl McDonaugh, saying there were several "hostile workplace complaints" filed by other employees against her. Grimaldi said he warned Gordon that if he didn't take action, "You are going to lose your whole government."

### d. Unnecessary Burden

Given all that Grimaldi has accomplished through the media and other avenues available to him, there is nothing more a name-clearing hearing would accomplish other than being an unnecessary burden on the County.

A formal name-clearing hearing would not have allowed Grimaldi to accomplish anymore than he did on his own. To be frank, Grimaldi just does not have anything to say now that he had already not said when he got fired. Where an employee has accomplished on his own what a name-clearing hearing is intended to afford – an opportunity to clear the employee's name – there is no need for a formal name-clearing hearing.[27] I certainly agree with that and have granted the Defendants'

---

[27] *Laforgia v. Davis*, 2004 WL 2884524, at *9 (S.D.N.Y. Dec. 14, 2004); *Baden v. Koch*, 799 F.2d 825, 832-33 (2d. Cir. Aug. 21, 2986).

21

Motion for Summary Judgment based on the Defendants' argument that Grimaldi did all that could be done to clear his name at the time of his firing and that a formal name-clearing hearing at the time of his firing, or any other time, would not have offered Grimaldi a better opportunity to clear his name.

### III. Qualified Immunity

Gordon argues that he is immune from personal liability for Grimaldi's claim for monetary damages. I agree. Government officials are immune from personal liability for civil damages arising from a constitutional violation unless the plaintiff can show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[28] Gordon agrees that Grimaldi had a right to a name-clearing hearing. However, Gordon argues that Grimaldi had to ask for a name-clearing hearing. I agreed with that argument. Thus, Gordon did not violate Grimaldi's constitutional rights. Even if Grimaldi is ultimately correct in his argument that Gordon – presumably through the County – had to offer him a name-clearing hearing instead of having him ask for one, that position was hardly "clearly established' at the time. Therefore, I have granted Gordon's Motion for Summary Judgment on this argument.

---

[28] *Harlow v. Fitzgerald* 457 U.S. 800, 818 (1982).

22

## CONCLUSION

I have granted the Motion for Summary Judgment filed by Defendants Thomas Gordon and New Castle County, concluding that (1) Grimaldi's stigma-plus defamation claim fails because he did not ask the Defendants for a name-clearing hearing, (2) Grimaldi, because of his position and past, was able to tell his side of the story to all that were interested in it, and (3) Gordon is not personally liable to Grimaldi for monetary damages because Gordon and the County did not deny Grimaldi a name-clearing hearing.

IT IS SO ORDERED.[29]

Very truly yours,

*/s/ E. Scott Bradley*

E. Scott Bradley

ESB/sal

oc:  Prothonotary

---

[29] Since I have granted the Defendants' Motion for Summary Judgment there is no longer a need to decide the Defendants' Motions in Limine as they are now moot.